IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **MICHAEL JOHNSTON,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO.: 2:23-cv-00554-NAD |
| ) | |
| **DUNLAP & KYLE COMPANY, INC.,** ) | **OPPOSED** |
| **GATEWAY TIRE BIRMINGHAM,** ) | |
| **INC., RICHARD DUNLAP, AND** ) | |
| **DOUG DUNLAP,** ) | |
| ) | |
| Defendants. ) | |

### DEFENDANTS' MOTION FOR SANCTIONS FOR WITNESS TAMPERING, CONCEALMENT OF EVIDENCE, AND BAD FAITH CONDUCT IN DISCOVERY

Defendants Dunlap & Kyle Company, Inc., Gateway Tire Birmingham, Inc., Richard Dunlap, and Doug Dunlap move the court pursuant to its inherent authority to issue sanctions against Plaintiff Michael Johnston for witness tampering, concealment of evidence, and bad faith conduct in the course of discovery.

**I.     INTRODUCTION**

Plaintiff Michael Johnston has engaged in bad faith conduct, including witness tampering, that shows contempt and disrespect for the judicial process. Johnston has actively worked to conceal evidence that is harmful to his case and decreases his damages by providing deceitful discovery responses and deposition testimony. When Johnston's lies were being uncovered, he did not supplement his

4883-4012-2309

responses or testimony, but rather requested a witness lie to defense counsel. Johnston's actions are egregious and warrant sanctions.

## II. STATEMENT OF RELEVANT FACTS

### A. Johnston's Claims

This action arises from Johnston's employment with Defendant Dunlap & Kyle. Dunlap & Kyle is a wholesale tire distributor and employed Johnston as a salesman. On May 1, 2023, Johnston filed his Complaint against Defendants alleging age discrimination, hostile work environment, and retaliation in violation of the ADEA. (*See* Doc. 1.) Johnston has also brought claims alleging violations of the Fair Labor Standards Act, breach of contract, unjust enrichment/quantum meruit, and fraudulent suppression. (*Id.* at pp. 28-32.) Johnston bases these latter four claims on his assertion that he continued to perform work for Dunlap & Kyle after he was terminated, but Dunlap & Kyle did not compensate him for his work. (*Id.* ¶¶ 184, 188-89, 199, 204, 210.) Specifically, Johnston contends he worked at least full-time without compensation from: July 17, 2020 – January 29, 2021, August 16, 2021 – October 29, 2021, and May 12, 2022 – June 30, 2022. (Discovery Responses, attached as **Exhibit A**, pp. 16-17; Doc. 1 ¶ 122, 124-25.) Johnston is seeking backpay for these periods as well as to at least January 10, 2024. (Ex. A, Discovery Responses, pp. 16-17.) Johnston alleges Dunlap & Kyle management told him to "hang in there," and he would be put back on payroll: "I continued to work every

time I was taken off payroll, and I was only informed – the only way I found out is my direct deposits stopped. So I continued to work…" (Johnston Depo., attached as **Exhibit B**, pp. 131:9-13.) Johnston testified he continued to work based on reliance on statements he was going to be put back on payroll. (*Id.* at p. 306:11-15.) Johnston claims that every time he was taken off payroll management was aware he continued to work and told him to keep doing what he was doing. (*Id.* at pp. 310:4-312:7.)

### B.    Johnston's Fraudulent Acts in Discovery

Johnston served his interrogatory responses to Defendants on January 8, 2024 and executed his responses on January 10, 2024. (Ex. A, Discovery Responses, pp. 26-27.) Interrogatory 12 requested Johnston

> 12.    Identify each and every entity or person from whom you have sought employment since the beginning of your employment with Dunlap & Kyle Company, Inc. in 2018 through present and for each entity or person you identify, state the following:
> (a)    The name of the person or entity;
> (b)    The date you sought employment with the person or entity; and
> (c)    Whether the person or entity offered you a position or job.
> (d)    If you accepted the job, how much compensation you earned while employed there.

Johnston provided a long list of places he had applied to work as well as documents supporting he had applied. (Ex. A, Discovery Responses, pp. 13-15, 33.) Despite listing 48 companies from which he had sought employment, Johnston did not list or mention BestDrive, LLC nor Tires Unlimited Enterprises, LLC anywhere

3

is his discovery responses. Johnston testified his interrogatories contained where he interviewed, and that he did not get a job offer. (Ex. B. Johnston Depo., pp. 271-272.) Johnston also testified that before his current position at National Tire Wholesale he worked for Transworld Business Advisors. (*Id.* at pp. 13:20-23.) Defendant's interrogatories asked Johnston further about his employment history:

> From January 2015 to the present, describe in detail Plaintiff's work history, including:
> (a)  Positions Plaintiff held and for (or with) whom;
> (b)  Corresponding dates;
> (c)  Manner and rate of pay in each position held, as well as Plaintiff's income from the position or work;
> (d)  The locations of Plaintiff's employment or where work was performed;
> (e)  Any documents, including electronic messages and postings, known to or possessed by Plaintiff (or others within his control) that reference any facts or other information provided in response; and
> (f)  Reason(s) Plaintiff's employment ended.

The only employer Johnston listed for January – October 2021 was the Defendants. (Ex. A, Discovery Responses, p.4.) During his deposition on April 18, 2024, Johnston was questioned extensively about the work he allegedly performed for Defendants in August and September of 2021. This time period is critical to several of Johnston's claims. Despite being terminated on August 13, 2021, Johnston contends he continued to work uncompensated based on statements from management he would be put back on payroll. (Ex. B, Johnston Depo., pp. 131:9-13, p. 306:11-15.) Johnston testified repeatedly that he continued to see dealers

(customers) on behalf of Gateway, working from his home and vehicle more than 40 hours a week.

> **Q:** And you were rehired in September. What were you doing during that period between August and September? Were you just waiting for things to get sorted out?
> **A.** I was still actually seeing dealers, but I was, again, being told, hey, wait till -- you know, wait till the dust settles and we make a decision about the leadership of Birmingham.
> **Q.** You were being told to wait to do any work until we get the leadership back in Birmingham?
> **A.** What they were saying is do not try to go back and work inside the Birmingham warehouse per se. We are going to try to sort things out and make a decision about what we are going to do about the leadership in Birmingham.
> **Q**. Okay.
> **A**. I was doing as instructed.
> **Q:** Okay. That's fine, but -- so how many dealers did you see during that time period?
> **A.** Well, you're talking about, what, like, 30 to 45 days?
> **Q.** Yeah.
> **A.** I mean, it's hard to -- I mean, I was still trying to set up and talk to new dealers that I knew had not had an account set up.
> **Q.** And these were all dealers in Birmingham area?
> **A.** Yes. And then again -- then when I was put back on payroll, obviously, it was going to be in a role in the reconnaissance side.
> **Q.** Were you -- did you keep track of any time or hours that you worked during this time period?
> **A**. Not that I recall, but I was still working more than 40 hours a week.
> **Q**. And were you working from your home?
> **A**. Home and from my vehicle.

(Ex. B, Johnston Depo., p. 277-79.)

> **Q**. Is it your testimony you were doing this that whole 45 days, or was there a period of time that you stopped because you had been told let's wait to see what happens?
> **A.** Well, I wasn't working on the -- I mean, I wasn't working on Saturday and Sundays, so we're talking about Monday through Friday.

5

> But I was told, hey, just sit tight. Let the dust settle. Let us figure out what we're going to do in Birmingham. And so that's what I did.
> **Q.** So, again, was there any period of time between August and September 23rd that you were not actively working, that you were waiting to hear what was happening?
> **A.** I continued to work. There was never a day I did not work. I wasn't raised like that.

(Ex. B, Johnston Depo., p. 280:1-18.)

> **A**. I mean, I was -- I know I was working more than 40 hours a week, but we're talking about a limited amount of time too.

(Ex. B, Johnston Depo., p. 283:11-13.)

> **A.** I was actively, you know, seeking other dealers that I couldn't get the either can't get the application back or couldn't produce a copy of it because the email got cut off.
> **Q.** Okay. And were you out on the road during that time?
> **A**. Yes. Yeah. Work -- worked from home but worked out of my vehicle.
> **Q.** And then the second time period from that August 2021 through September of 2021, also making calls, sales calls during that entire time?
> **A.** Yes.
> **Q.** Okay. Out on the road?
> **A.** Right. Working -- working.

(Ex. B, Johnston Depo., p. 292:22-293:14.)

Johnston filled out an application reapplying for employment with Dunlap & Kyle on October 1, 2021. (Ex. B, Johnston Depo., 212:7-11; Employment Application, attached as **Exhibit C**.) Under his current or most recent employer Johnston only listed Tire Engineers, Inc. (Ex. C at p.4.) Johnston was deposed last year on July 25, 2023 is the divorce action he filed against his former wife. (*See*

Johnston Divorce Deposition Transcript, attached as **Exhibit D**.) In that matter, Johnston testified he was not working for Gateway and was unemployed when he got married on September 18, 2021.

> Q. And how long had you worked for Gateway?
> A. Which time?
> Q. The most recent time.
> A. A total of four – a little over four years.
> Q. And was there a break in that employment?
> A. Yes.
> Q. For how long of a period?
> A. Which time?
> Q. Last time.
> A. Six months.
> Q. Okay. Were you working for Gateway when you got married?
> A. No.
> Q. Okay. When you got married to Shelly, who were you working for?
> A. I was unemployed.

(Ex. D, Johnston Divorce Testimony pp.7:8-21, 16:8-17:3.)

Following Johnston's deposition in this case, Defendants learned Johnston may have failed to disclose additional employers BestDrive, LLC and Tires Unlimited Enterprises, LLC. On April 24, 2024, defense counsel contacted Steve Brace, owner of Tires Unlimited, who confirmed Johnston had worked there though he could not recall the dates. On May 6, 2024, Defendants issued subpoenas to BestDrive, LLC and Tires Unlimited Enterprises, LLC. (Subpoenas to BestDrive, LLC and Tires Unlimited, attached as **Exhibit E**.)

In response to Defendants' subpoena, Brace produced his text messages with Johnston. Brace and Johnston texted on April 24, 2024 after Brace had been

contacted by defense counsel.

>**Brace:** Hey man, an attorney firm just called me asking questions about you and gateway and employment here from 10/5/21 for those 5 or 6 weeks here that you worked i didn't want to say anything because I wasn't aware of what is going on. I need to know what to say real quick like because I told her to give me a call later because I was unloading containers. Just give me a quick description of what I need to say. I really don't want to be involved in anything.
>
>**Johnston:** My apology that you were called about anything. Was not my intention or aware you would be called. by any mean. Attorney asked me what customers that I called continued to call on you after Gateway stopped paying me. Told them I saw dealers after Gateway stopped paying me and saw that tires were still being delivered to those customers.
>
>I would just say… "Michael was the reason that I started buying from Gateway and continued buying from them." "He did a really good job for Gateway and I was disappointed to hear later on he was not with them." <u>I had forgot about working for you for those few weeks so did not bring it up. IF that is asked about just say…."Michael handled some clerical duties while he was looking for a job"</u>
>
>Hope you are doing well too!

(Brace Texts with Michael Johnston, attached as **Exhibit F**)

Thankfully, Brace did not follow Johnston's direction. Brace produced his bank records and text messages with Johnston. Brace's bank records show Brace paid Johnston on October 6, 2021 for 2.5 weeks payroll. (Bank Records, attached as **Exhibit G**). Johnston cashed or deposited the check following day. (*Id.*) Brace also explained when he hired Johnston and what work Johnston was to perform for Tires Unlimited. (*See* Statement of Steve Brace, attached as **Exhibit H**).

BestDrive, LLC also produced documents evidencing Johnston's employment. Specifically, BestDrive produced Johnston payroll and personnel records and emails concerning Johnston's employment. These records show Johnston worked from BestDrive from January 15, 2024 to April 5, 2024. (BestDrive, LLC Records, attached as **Exhibit I**). Johnston had already accepted employment with BestDrive when he executed his interrogatory responses and his employment with BestDrive had ended a mere 2 weeks prior to his deposition. However, Johnston never disclosed his employment at BestDrive, LLC nor Tires Unlimited. Instead, Johnston actively worked to conceal evidence that contradicted his claims and decreased his damages.

### III. ARGUMENT

#### A. Plaintiff has committed a fraud upon Defendants and this Court warranting the sanction of dismissal of his Complaint pursuant to this Court's inherent authority.

Courts have the inherent power to police those appearing before them. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, (1991). A court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (quoting *Chambers*, 502 U.S. 32, 43). A court may exercise this power "to sanction the willful disobedience of a court order, and to sanction a party who

has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013)). This power "must be exercised with restraint and discretion" and used "to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* (quoting *Chambers*, 501 U.S. at 43). The dual purpose of this power is to vindicate judicial authority without resorting to a contempt of court sanction and to make the prevailing party whole. *Id.* (citing *Chambers*, 501 U.S. at 46). The key to unlocking a court's inherent power is a finding of bad faith. *Id.* (citing *Sciarretta v. Lincoln Nat. Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015)). "To impose sanctions under these inherent powers, the court first must find bad faith." *In re Walker*, 532 F.3d 1304, 1309 (11th Cir.2008).

### 1. <u>Defendants have met their burden of showing Johnston's bad faith.</u>

"In the context of inherent powers, the party moving for sanctions must show subjective bad faith." *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020) (citations omitted). "This standard can be met either (1) with direct evidence of the [party's] subjective bad faith or (2) with evidence of conduct "so egregious that it could only be committed in bad faith." *Id.* "Bad faith exists when the court finds that a fraud has been practiced upon it, or 'that the very temple of justice has been defiled,' or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order.'" *Githieya v. Glob. Tel\*Link Corp.*, 608 F. Supp. 3d 1290, 1297 (N.D. Ga. 2020) (citations

omitted). "In assessing whether an award is proper under the bad faith standard, 'the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case." *Id.; see Byrne v. Nezhat*, 261 F.3d 1075, 1125 (11th Cir.2001) ("A false statement can be evidence of bad faith, if, for instance, there is other evidence in the record indicating that the statement was made for a harassing or frivolous purpose."). The inherent power to sanction is appropriately exercised when a party "commits perjury or ... doctors evidence" that "relates to the pivotal or 'linchpin' issue in the case." *In re Brican Am. LLC Equip. Lease Litig.*, 977 F. Supp. 2d 1287, 1292 (S.D. Fla. 2013), report and recommendation adopted sub nom. *In re: Brican Am. LLC*, No. 10-MD-02183-PAS, 2013 WL 12092311 (S.D. Fla. Nov. 15, 2013) (citation omitted). And where the client has made a "knowing factual misrepresentation" or is the "mastermind" behind the frivolous case, sanctions against a client are appropriate. *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1315 (11th Cir. 2021) (quoting *Byrne*, 261 F.3d at 1118).

Johnston has engaged in sanctionable misconduct by attempting to conceal evidence pivotal to his claims and damages. First, Johnston actively attempted to conceal he had obtained subsequent employment which directly impacts his damages. Although he had already accepted employment with BestDrive at the time he executed his interrogatories and was scheduled to begin his position in 5 days, BestDrive appears nowhere in Johnston's interrogatory responses. Johnston

provided a list of 48 companies from which is sought employment for the period of October 11, 2023 – January 10, 2024. However, Johnston did not disclose the company from which he had actually obtained an offer and accepted. In his deposition, Johnston was asked about his job search. Specifically, Johnston was asked where he interviewed, and if he had any offers. Johnston admitted he had some interviews, though again did not mention BestDrive, and further stated he did not get a job offer. (Ex B, Johnston Depo., pp. 271-272.) Johnston's employment with BestDrive had ended a mere two weeks before his deposition, but when questioned where he worked prior to his current job, Johnston only disclosed Transworld Business Advisors, where he had not received any compensation. (Ex B, Johnston Depo., pp. 13:20-23.) Johnston's responses show a clear effort to hide his employment at BestDrive and subsequent decrease in his available damages. Indeed, his salary at BestDrive was slightly more than he made at Dunlap & Kyle. Johnston's disclosures of dozens of other companies he had sought but not obtained employment, and the fact Johnston had worked at BestDrive only a couple weeks prior to his deposition, shows Johnston attempted to hide evidence.

Second, Johnston actively sought to conceal his employment at Tires Unlimited during a period in which he is claiming he was working more than 40 hours a week for Defendants. Interrogatory No. 12 requests everywhere Johnston had sought employment since the beginning of his employment at Dunlap & Kyle

in 2018. Thus, this includes any employment Johnston had during the periods of time he was not employed by Dunlap & Kyle. Interrogatory Number 3 also requests Johnston's complete work history since 2015. In his response to both requests, Johnston did not disclose his employment at Tires Unlimited in 2021. Defense counsel only learned of this employment through speaking with witnesses after Johnston's deposition. Defense counsel reached out to the owner of Tires Unlimited and issued the company a subpoena. The response to the subpoena revealed Johnston worked for Tires Unlimited in September and October 2021 – the exact time period in which Johnston testified he was working more than 40 hours a week calling on dealers and racking up expenses for Gateway Tire.

Johnston was questioned repeatedly about his actions and work in August-September 2021 following his termination from Gateway Tire. Johnston testified repeatedly that he was performing work for Gateway Tire because he was told to keep doing what he was doing and that he would be placed back on payroll. He testified he worked Monday-Friday from his home and vehicle, working for more than 40 hours a week, calling on about 5 dealers a day. Johnston testified he was never reimbursed for his expenses during this period and was not compensated. This is inconsistent with his prior under oath testimony that he was not working for Gateway on September 18, 2021 and was in fact unemployed. (Ex. D, Johnston Divorce Testimony, p. 16-17.)

The records from Tires Unlimited show Johnston received a payroll check on October 6, 2021 for the preceding 2.5 weeks. (Ex., H, Brace Dec., ¶ 10; Ex. G.) Johnston filled out his application for rehire with Dunlap & Kyle five days earlier. (Ex. C.) According to Brace, Johnston came into his shop in August or September 2021 and expressed he no longer worked for Gateway Tire and was interested in coming to work for Brace as a salesman. (Ex. H, Brace Dec., ¶ 5.) Brace agreed to hire Johnston at Johnston's salary request of $2,500.00 per week, and Brace paid Johnston by check on October 6, 2021. (*Id.* at ¶¶ 7, 10) Johnston cashed or deposited the check the following day. (Ex. G.) Brace paid Johnston for the other weeks he worked in cash. (Ex. H, Brace Dec., ¶¶ 8, 10.) Brace terminated Johnston's employment in October 2021 due to Johnston's lack of sales. (*Id.* ¶ 11.)

Even if Johnston had forgotten about this employment that directly contradicts his claims, he engaged in bad faith conduct because he attempted to actively conceal this evidence. After Brace contacted Johnston and "reminded" him about his employment at Tires Unlimited, Johnston did not supplement his discovery responses nor his deposition testimony. Rather, Johnston actively tried to conceal the information harmful to his case. Defense counsel even asked Johnston to supplement his responses regarding his employment and income, but he did not supplement his responses. Johnston instructed Brace to not only sing Johnston's praises as a Gateway Tire employee, but Johnston instructed Brace not offer any

information about his employment at Tires Unlimited and to not disclose the nature of his work for Tires Unlimited: "'IF that is asked about just say….."Michael handled some clerical duties while he was looking for a job'" (Ex. F.) This is not true. (Ex. H, Brace Dec., ¶ 17.) Johnston worked for Brace as a salesman. (*Id.*) Johnston did not testify he was looking for a job at this time, rather, Johnston testified he continued to work for Gateway Tire because it was represented to him he would be put back on payroll. However, in his text to Brace, Johnston admitted he had worked for Brace, "I had forgot I worked for you those weeks…" (Ex. F.) Johnston tried to conceal evidence that directly contradicted his claims and allegations that he believed he was still a Gateway employee and was working for Gateway.

### 2. Dismissal is the proper sanction for Johnston's bad faith conduct.

When crafting the proper sanction for bad faith conduct, the court "must impose a sanction that punishes Defendant for its serious bad faith conduct and burdening of the litigation and judicial process, and provide a remedy that serves as a deterrent as well as provide a genuine remedy for [Defendants] that is properly tailored." *Githieya v. Glob. Tel\*Link Corp.*, 608 F. Supp. 3d 1290, 1329 (N.D. Ga. 2020). A party's inconsistent statements or attempts to conceal information may warrant the sanction of dismissal. *See Ramsey v. Broy*, No. 08-CV-0290-MJR-DGW, 2010 WL 1251199, at *4 (S.D. Ill. Mar. 24, 2010) (dismissing case of plaintiff who attempted to bribe witness because monetary damages would not suffice and

there was no evidence to exclude because the witness testified truthfully); *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 77 (5th Cir. 2011) (affirming district court's dismissal of plaintiff's claims based on his inconsistent statements under oath regarding the reason he left his job at defendant employer).

Sanctions less than dismissal would not suffice to remedy the wrongs of Johnston's bad faith and serve as a deterrent. First, monetary sanctions are unlikely to be effective because it is unlikely Johnston would be able to pay sanctions proportional to his misconduct. Second, there is no evidence to exclude because the witness Johnston tampered with did not provide the false testimony Johnston sought. Johnston's actions show clear contempt for the judicial process and dismissal is warranted.

### 3. Defendants are entitled to attorneys' fees and costs.

As a sanction for bad faith conduct, the Court may assess attorneys' fees. *JTR Enterprises, LLC v. An Unknown Quantity,* 93 F. Supp. 3d 1331, 1365 (S.D. Fla. 2015), *aff'd sub nom. JTR Enterprises, LLC v. Columbian Emeralds*, 697 F. App'x 976 (11th Cir. 2017) (citing *Chambers*, 501 U.S. at 45–46). This assessment of attorneys' fees is an exception to the American Rule, which generally prohibits fee-shifting. *Id.* "When a court uses its inherent authority to award a sanction in the form of attorney's fees, legal fees awarded 'must be compensatory rather than punitive'— at least in civil litigation." *J.C. Penney Corp., Inc. v. Oxford Mall, LLC*, 100 F.4th

1340, 1347 (11th Cir. 2024) (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017)). "Because the purpose of this fee-shifting mechanism is to reimburse the victim, a causal connection is required between the fees awarded and the sanctioned party's misconduct." *Id*. "So the complaining party may only recover those fees it would not have incurred "but for" its opponent's misconduct." *Id*. "Under this approach, the court's "fundamental job" is to decide whether a legal fee would have existed even without the sanctioned conduct." *Id*. (citing *Goodyear*, 581 U.S. 110).

Johnston's bad faith unnecessarily delayed Defendants' obtaining information critical to the case and has necessitated Defendant's filing of this motion. Had Johnston been truthful in his discovery responses and deposition testimony, and forthcoming with supplementation as opposed to actively working to conceal the information, there would have been no need for Defendants to seek sanctions. Accordingly, Defendants are entitled to their attorneys' fees accumulated by the preparing and filing of this motion.

## IV.   CONCLUSION

Johnston has engaged in fraud against Defendants and this court. He has sought to hide critical information because it is harmful to his case by providing deceitful discovery responses and deposition testimony and tampering with a witness after Defendants uncovered his lies. Had Johnston been truthful about his

17

employment history and activities during the time periods at issue in the Complaint, it could have narrowed the issues in dispute and focused discovery. Johnston's conduct is egregious and warrants sanctions.

Respectfully submitted this the 16th day of July, 2024.

/s/ Rachel V. Barlotta
RACHEL V. BARLOTTA
KAYLA M. WUNDERLICH
BAKER, DONELSON, BEARMAN
 CALDWELL & BERKOWITZ, P.C.
1901 Sixth Avenue North, Suite 2600
Birmingham, Alabama  35203
Telephone: (205) 328-0480
kwunderlich@bakerdonelson.com
rbarlotta@bakerdonelson.com
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a true and accurate copy of the foregoing by filing the same via the court filing system on all counsel of record on July 16, 2024.

Patricia A. Gill
Barrett & Farahany
2 20th Street North, Suite 900
Birmingham, AL  35203
trish@justiceatwork.com

/s/ Rachel V. Barlotta
OF COUNSEL

18

4883-4012-2309