## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

MICHAEL JOHNSTON,　　　　　　)
　　　　　　　　　　　　　　　)
　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　)　　　Case No. 2:23-cv-00554-NAD
　　　　　　　　　　　　　　　)
DUNLAP & KYLE COMPANY,　　　 )
INC., et al.,　　　　　　　　 )
　　　　　　　　　　　　　　　)
　　　Defendants.　　　　　　 )

### MEMORANDUM OPINION AND ORDER DENYING IN PART
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

For the reasons stated below and on the record in the oral argument motion

hearing, the court **GRANTS IN PART** and **DENIES IN PART** the motion for

summary judgment filed by Defendants Dunlap & Kyle Company, Inc., Gateway

Tire, Inc., Richard Dunlap, and Doug Dunlap (Doc. 36). On the seven claims for

relief alleged by Plaintiff Michael Johnston, the court **GRANTS** summary judgment

on Counts 1, 2, 3, 4, 5, and 7, and **DENIES** summary judgment on Count 6 (quantum

meruit). By separate order, the court will set this case for a status conference.

### INTRODUCTION

This case is about Johnston's "on again, off again" employment relationship

with Defendants Dunlap & Kyle and Gateway Tire (collectively, DK) from 2018 to

2022. At all relevant times, DK was a family-run business that was owned and

operated by members of the Dunlap family, including Defendants Richard Dunlap and Doug Dunlap.  And, at all relevant times, Johnston was over 40 years old.  *See* Doc. 1.

Johnston stopped working for DK in June 2022, at the latest.  After receiving an EEOC right to sue letter, Johnston filed this action, alleging the following seven claims for relief:

(1)    retaliation under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., based on allegations that he was terminated and not allowed to return to an outside sales position after complaining about age discrimination (Doc. 1 at 24–25);

(2)    age discrimination under the ADEA, based on allegations of disparate treatment in which he was treated differently from younger employees (Doc. 1 at 25–27);

(3)    hostile work environment, based on allegations that he and other older employees were "treated in a very hostile and demeaning manner on a regular basis" such that it altered the terms and conditions of his employment (Doc. 1 at 27–28);

(4)    violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq., based on allegations that he was not paid from August 13, 2021, to October 29, 2021, and from May 13, 2022, to June 30, 2022 (Doc. 1 at 28–30);

(5)    breach of contract, based on allegations that DK violated an implied contract to pay him $120,000 per year (Doc. 1 at 30–31);

(6)    quantum meruit (and/or unjust enrichment), based on allegations that he was not paid the reasonable value of his services after July 20, 2020 (Doc. 1 at 31–32); and,

(7)    fraudulent suppression, based on allegations that Richard Dunlap and Doug Dunlap "fraudulently suppressed the fact that he had been terminated on May 13, 2022, and taken off the payroll" (Doc. 1 at 32, labeled "Count 8" in the complaint).

Doc. 1.    Johnston seeks reinstatement, unpaid and lost wages, compensatory, liquidated, and punitive damages, out of pocket expenses, and loss of benefits.    Doc. 1 at 33–34.

On Defendants' summary judgment motion (Doc. 36), there are genuine issues of material fact for trial on Johnston's quantum meruit claim (Count 6), but Defendants otherwise are entitled to judgment as a matter of law on Johnston's remaining claims (Counts 1, 2, 3, 4, 5, and 7).

## BACKGROUND

### A.    Factual background

The record evidence shows the following:

Dunlap & Kyle is a tire wholesaler headquartered in Batesville, Mississippi, which shares ownership and operations with Gateway Tire, a tire warehouse in Birmingham, Alabama.    Doc. 37-3 at 5; Doc. 37-4 at 4–5; Doc. 37-5 at 3; Doc. 37-1 at 1.

Bob Dunlap—who is over 90 years old—is the CEO of DK.    Bob Dunlap is the father of <u>Defendant</u> Richard Dunlap and Michael Dunlap, and the grandfather of Richard's son, <u>Defendant</u> Doug Dunlap, and Michael's son, Robert Dunlap—all of whom worked at DK at relevant times.    Doc. 37-4 at 4–5; Doc. 37-5 at 4–5; Doc.

37-11 at 4–5.

At relevant times, Dennis King worked in management for DK (Doc. 37-4 at 4), and Mike Griffin worked in middle management and sales for DK (Doc. 37-13 at 4–6).  With the exception of <u>Defendant</u> Doug Dunlap (and at all pertinent times), the relevant management of DK was over 40 years old.  *See, e.g.*, Doc. 37-1 at 2; Doc. 37-2 at 2.

### 1. Johnston's initial employment with DK (2018–2019)

Johnston began working for DK as an outside salesman in 2018 after meeting with Bob Dunlap, Dennis King, and Michael Dunlap.  Doc. 37-3 at 5, 16; Doc. 37-17 at 4; *see* Doc. 37-7 at 13.  At that meeting, Bob Dunlap offered Johnston a salary of $120,000 per year, and that was Johnston's salary when he began working for DK.  Doc. 37-3 at 16; Doc. 44-1.  Johnston was in his late 40s at the time that he first was hired at DK.  Doc. 37-3 at 23.

As an outside salesman, Johnston called on customers for new business and delivered tires.  Doc. 37-3 at 17.  When he started working for DK, Johnston signed a handbook acknowledging that he was an at-will employee without a contract.  Doc. 37-7 at 18.  Johnston testified in his deposition that he never signed a written contract with DK.  Doc. 37-3 at 66.

On or about November 7, 2019, Johnston was terminated and removed from the payroll at DK.  Doc. 37-3 at 21.  Johnston was paid severance.  Doc.  37-1 at 2;

Doc. 37-7 at 11.

Johnston testified in his deposition that he continued to work for DK and "was assured that he would be put back on the payroll," despite being removed from the payroll and from DK's insurance program. Doc. 37-3 at 22, 25, 34–35. Johnston testified that DK management told him to "keep doing what you're doing," that management was "aware" that Johnston was "setting up accounts and trying to help sell the company tires," and that management told Johnston he would be put back on the payroll. Doc. 37-3 at 35–36. Johnston testified that he had no documentary or written evidence that he was told he would be put back on the DK payroll. Doc. 37-3 at 37.

### 2.    Johnston's second period on DK payroll (February–July 2020)

On February 1, 2020, Johnston filled out a rehire application. Doc. 37-3 at 23; Doc. 37-7 at 2. Under the salary section of the application, Johnston wrote "TBT from the Dunlap family." Doc. 37-3 at 23; Doc. 37-7 at 3. Johnston also sent an email stating that he was fine with whatever pay Michael Dunlap decided; the email had a handwritten note stating that Johnston would receive the same pay. Doc. 44-2. Johnston testified that when he was rehired in 2020 his salary "was discussed verbally" and he was "led to believe it would be what he was previously hired at." Doc. 37-3 at 23.

On February 28, 2020, Johnston was placed back on the DK payroll as an

outside salesman reporting to Michael Dunlap, who had rehired him. Doc. 37-3 at 23. Johnston also received backpay, and his pay was backdated to January 1, 2020. Doc. 44-3.

On July 17, 2020, Johnston was removed from the DK payroll for a second time; this time in connection with a contract which he signed related to a warehouse, and which resulted in litigation. Doc. 37-3 at 26, 33; Doc. 37-7 at 52. Johnston's DK company email was deactivated at that time. Doc. 37-3 at 39. Johnston was terminated by King, with the approval of Bob Dunlap. Doc. 37-1 at 2; Doc. 37-4 at 6.

On August 1, 2020, Johnston was provided COBRA paperwork. Doc. 37-7 at 128.

Other employees were told that Johnston was no longer a DK employee. Doc. 37-7 at 55. A letter from King at that time indicated that some DK employees, including Griffin, expressed happiness that Johnston had been terminated. Doc. 37-7 at 53–54. Griffin and other employees also wrote letters to Bob Dunlap, stating why they were glad that Johnston was being terminated and that they did not support rehiring him. Doc. 37-7 at 63, 75–81.

Johnston testified that he continued working on behalf of DK after being removed from the payroll. Doc. 37-3 at 35.

On August 4, 2020, Robert Dunlap sent an email stating that "I think

[Johnston] still thinks he works for us."  Doc. 44-22.

On August 20, 2020, Johnston's DK company email was turned back on.  Doc. 37-3 at 39; Doc. 44-5.  But it appears that his email was not connected and Johnston could not access it from November 9, 2020, to January 2021.  Doc. 44-6; Doc. 37-3 at 48.

In January 2021, Johnston emailed DK credit applications for several customers.  Doc. 44-12.

### 3.    Johnston's third period on DK payroll (January–August 2021)

On January 20, 2021, King emailed Griffin and Michael Dunlap, suggesting that DK bring Johnston back on board at a different salary structure, so long as Johnston would work on being a team player.  Doc. 37-3 at 31; Doc. 37-7 at 60; Doc. 44-16.

On January 21, 2021, Johnston filled out another rehire application, in which he stated that his previous salary, ending in 2020, had been $120,000 per year.  Doc. 37-3 at 34; Doc. 37-7 at 24.

On January 29, 2021, Johnston was put back on the DK payroll again, this time at a salary of $84,000 per year.  Doc. 37-3 at 34, 38, 46.

Johnston testified that when he was rehired in 2021 he "expected it to be what [he] was hired in at too."  Doc. 37-3 at 47.  But Johnston conceded that he never objected to his lower salary.  Doc. 37-3 at 47.

On April 12, 2021, Doug Dunlap became manager of the tire warehouse in Birmingham (i.e., Gateway Tire), and Griffin—who had been acting as manager at Gateway Tire—was moved to outside salesman.  Doc. 37-13 at 9.

On April 23, 2021, Doug Dunlap emailed King, stating that Johnston was "unmanageable," and that employees were complaining about Johnston.  Doc. 37-7 at 22.

On June 25, 2021, Johnston texted Michael Dunlap to say that Doug Dunlap had told Johnston to "get the F out of his office."  Doc. 44-8.

After Johnston was rehired in early 2021, some coworkers and customers complained about him.  Doc. 37-3 at 55; Doc. 37-7 at 49.

In August 2021, Johnston was taken off the DK payroll for a third time; this time by Doug Dunlap.  Doc. 37-3 at 52; Doc. 44-9; Doc. 44-21; Doc. 37-7 at 21, 68; Doc. 37-12 at 17.  Johnston was required to turn in his company computer and his DK company email again was turned off.  *See* Doc. 44-11.  Johnston again was provided COBRA paperwork.  Doc. 37-7 at 125.

On August 16, 2021, Johnston wrote a letter to Bob Dunlap and other DK team members about his grievances with Doug Dunlap.  Doc. 37-7 at 142; *see* Doc. 37-3 at 52.

Nowhere in that letter did Johnston mention being treated differently on account of his age.  Doc. 37-7 at 142–45; *see* Doc. 37-3 at 52–53.  Rather, as

Johnston testified, he felt that Doug Dunlap "treated [him] different[ly] from the other sales guys," and that "all of th[e] [other sales guys] were treated better than" Johnston was.  Doc. 37-3 at 53; *see* Doc. 37-7 at 142–45.

In the letter, Johnston stated that Doug Dunlap had been Johnston's "biggest fan" early in Doug's time at the tire warehouse in Birmingham.  Doc. 37-7 at 142. Johnston also mentioned in the letter an incident in which Doug had left unsecured merchandise unsupervised outside.  Doc. 37-7 at 143.  Johnston stated further in the letter that Doug transferred some of Johnston's accounts to Steve David.  Doc. 37-7 at 145.  David was over 40 years old at that time.  Doc. 37-15 at 2.

Johnston also stated in a separate, follow-up letter that, since Doug Dunlap had become manager of the Birmingham tire warehouse, Doug had been trying to "get rid of" Johnston for "1 rather obvious reason"—Johnston was not a "yes man." Doc. 37-7 at 38.  Johnston asserted in the letter that Doug had pressured other DK employees to sign a letter stating that they did not want Johnston to come back to work.  Doc. 37-7 at 39.

Johnston testified that Doug Dunlap treated him differently from all of the other salesmen, including salesmen who were older than Johnston.  Doc. 37-3 at 53. Johnston testified that he had complained to Bob Dunlap about not being treated like other salesmen.  Doc. 37-3 at 66.

Johnston also testified that Doug Dunlap showed favoritism to younger

salesmen by treating them differently and with more lenience. Doc. 37-3 at 68, 71. Johnston testified that Doug Dunlap called him "old man" and joked about his gray hair, but Johnston could not give an estimate of how many times that had occurred. Doc. 37-3 at 70–71. Doug Dunlap also opened Johnston's desk and forcibly disabled Johnston's company computer with a screwdriver when Johnston was terminated in August 2021. Doc. 37-12 at 5, 19; *see also* Doc. 38 (conventional filing).

August 2021 was the last time that Johnston worked directly with Doug Dunlap. Doc. 37-3 at 59.

Doug Dunlap and Richard Dunlap tried to get Johnston to sign a severance agreement around the time of his August 2021 termination. Doc. 37-3 at 52, 59, 61; Doc. 37-12 at 12, 18–19. On September 3, 2021, Doug Dunlap emailed a DK administrator to ask if Johnston ever had signed termination paperwork, and the administrator replied that to her knowledge Johnston had not signed a severance agreement. Doc. 44-13.

### 4. Johnston's fourth and final period on DK payroll (October 2021–May 2022)

From September 2021 into October 2021, Johnston was working for another company, Tires Unlimited. Doc. 37-20 at 4. But on October 1, 2021, Johnston once again filled out a rehire application at DK; under "salary required" he wrote that his salary until July 2020 had been $120,000 per year. Doc. 44-14. The application has a handwritten note that says "same pay" and a date of hire of September 23, 2021.

Doc. 44-14.  Johnston testified that he did not negotiate the salary.  Doc. 37-3 at 55.

In an email, Johnston told a DK administrator to "confirm with Michael" on his pay.

Doc. 37-7 at 47.

On October 29, 2021, Johnston once again was put back on the DK payroll.

Doc. 37-7 at 44.  Johnston again signed a handbook stating that he was an at-will

employee without a contract.  Doc. 37-7 at 20.

During this time, Johnston largely worked independently in a

"reconnaissance" sales role, reporting to Michael Dunlap; Johnston did not work

under Richard Dunlap or Doug Dunlap during this time period.  Doc. 37-3 at 55–56.

Johnston testified that during this time period he called customers on his cell phone.

Doc. 37-3 at 56.

On December 8, 2021, Johnston sent an email to Robert Dunlap about market

research he had been doing.  Doc. 44-18.  Johnston engaged in more email

correspondence about potential orders in late December 2021.  Doc. 44-19.  Email

traffic also shows that Johnston did some work with regard to Petlas Tires in

November 2021, December 2021, and January 2022.  Doc. 37-7 at 107–22.

After that, aside from Johnston's deposition testimony, there is practically no

evidence that Johnston actually was doing any work for DK.  There is no clear record

evidence that Johnston made any sales or had any meetings with customers in 2022.

In May 2022, King had DK's IT department check Johnston's DK emails; the

IT department reported to King that "Johnston had only sent one email in the last several months, and it was not work related." Doc. 37-1 at 2.

### 5. Johnston's final termination and DK's decision not to rehire him (May–July 2022)

On May 13, 2022, Johnston was removed from the DK payroll, without his knowledge, for the fourth and final time; Johnston testified that he only found out later, when he did not receive his direct deposit. Doc. 37-3 at 58. Johnston testified that he believed that Richard Dunlap and Doug Dunlap had him removed from the DK payroll, but also admitted that he "may be wrong"; Johnston testified that was his belief because Richard and Doug had tried to get him to sign a severance agreement in 2021. Doc. 37-3 at 59.

Johnston testified that, on June 30, 2022, he stopped doing work for DK. Doc. 37-7 at 58.

On July 21, 2022, Johnston met with Bob Dunlap in Mississippi. Doc. 37-3 at 58; *see* Doc. 37-7 at 50. Johnston testified that, when he talked to Bob Dunlap about being taken off the DK payroll, Bob "acted like he didn't know anything about it." Doc. 37-3 at 58. Bob told Johnston to talk to Griffin, and if Griffin wanted to rehire Johnston then that would be acceptable to Bob. Doc. 37-4 at 13; *see* Doc. 37-13 at 17.

Michael Dunlap testified in his deposition that Griffin met with Bob Dunlap, and that Griffin did not allow Johnston to come back to work. Doc. 37-5 at 13.

King testified in his deposition that "Bob did not tell [Johnston] that he was going to put him back on the payroll.  Bob told [Johnston] to go see Mike Griffin, and if Mike Griffin agreed that [Johnston] could go on the payroll, that Bob would allow it.  And Bob himself told [King] that."  Doc. 37-4 at 13; *see* Doc. 37-13 at 17.

On July 22, 2022, Griffin met with Johnston and told Johnston that Johnston would not be coming back to work for DK.  Doc. 37-3 at 62; Doc. 37-5 at 13, 20, 24.

Also on July 22, 2022, Johnston sent an email to Bob Dunlap, stating that Richard Dunlap and Doug Dunlap had fired Johnston in 2021 in retaliation for telling Bob about mistakes Doug had made.  Doc. 37-3 at 62.

On July 26, 2022, Johnston sent another email to Bob Dunlap, stating that he believed that Richard Dunlap and Doug Dunlap had told Griffin that Johnston wanted to take his job.  Doc. 37-7 at 56.  In the email, Johnston stated that he had "no doubt" that Richard and Doug "were clearly behind influencing and upsetting Mike Griffin."  Doc. 37-7 at 56–57.  Johnston stated that Doug was too immature and reckless to run a branch, that Richard and Doug had schemed against him because he was willing to speak up, and that as a manager Doug had treated Johnston poorly.  Doc. 37-7 at 57.

Nowhere in the email did Johnston mention that any of the alleged mistreatment had been on account of age.  Doc. 37-7 at 56–58.

Johnston sent another email to Bob Dunlap on July 29, 2022, seeking severance pay. Doc. 37-7 at 74. That email also did not mention any allegation of age discrimination. Doc. 37-7 at 74.

When asked, "Who made the decision to take [Johnston] off the payroll?" Bob Dunlap testified, "It would only be me," though Bob also testified, "I thought it was one time." Doc. 37-11 at 7.

In his deposition, King testified that he did not know who decided to terminate Johnston in 2022, stating "we cannot figure that out." Doc. 37-4 at 8.

When asked during his deposition why Richard Dunlap and Doug Dunlap would have directed that Johnston be removed from the DK payroll in 2022, Michael Dunlap testified, "I didn't know that they did. . . . I'm not surprised that they did." Doc. 37-5 at 19. Michael Dunlap testified that he did not know why Johnston's employment ended in 2022. Doc. 37-5 at 19.

Michael Dunlap also testified in his deposition, "I don't even know who terminated him [i.e., Johnston]" in 2022. Doc. 37-5 at 26.

Michael Dunlap testified that Johnston and Doug Dunlap had friction because Doug terminated Johnston in 2021. Doc. 37-5 at 8. Michael Dunlap testified further that he never had heard anyone, including Johnston, complain about Doug Dunlap treating older employees differently. Doc. 37-5 at 9. Michael Dunlap testified that he did not think Johnston "ever mentioned an age-related issue." Doc. 37-5 at 9.

Other DK employees over 40 years old—Cecil Bowden and Steve David—averred in sworn declarations that Doug Dunlap never treated them poorly or differently from other, younger employees, and that they signed letters stating that they were glad Johnston was terminated.  Doc. 37-14; Doc. 37-15.

In a sworn declaration, Richard Dunlap averred that he was not involved with hiring, terminating, or setting compensation for Johnston, and that he had no authority over Johnston.  Doc. 37-6 at 2.  Richard averred that he does not know why Johnston was terminated in 2022, and that he was not involved.  Doc. 37-6 at 2. Richard also averred that he was not involved in the decision not to hire Johnston back in 2022.  Doc. 37-6 at 2.  Richard averred further that he was not aware of any complaints Johnston made about age discrimination, and that Richard only learned that Johnston allegedly had complained of age discrimination through this lawsuit after Johnston's final termination.  Doc. 37-6 at 2.

Doug Dunlap also averred in a sworn declaration that he had no involvement with Johnston's employment after August 2021, and that he was not aware that Johnston had been rehired after August 2021.  Doc. 37-18 at 2.  Doug averred that he was not involved in Johnston's termination in 2022.  Doc. 37-18 at 2.

Doug Dunlap testified in his deposition that he was out of work with COVID in July 2022.  Doc. 37-12 at 16.

In his deposition, Griffin testified that in July 2022 Doug Dunlap was his

supervisor.  Doc. 37-13 at 6.  Griffin testified that he did not talk to Doug about Johnston in July 2022 because Doug was out of the office with COVID at that time. Doc. 37-13 at 17.  Griffin testified that he did not want to bring Johnston back on board at DK because Johnston was not a team player.  Doc. 37-13 at 20.  Griffin also testified that he knew that Johnston had met with Bob Dunlap because Richard Dunlap called Griffin and told him Johnston had been in Mississippi for a meeting, but he did not know what the meeting was about.  Doc. 37-13 at 20.

King testified in his deposition that he never had received any complaints about Doug Dunlap from Johnston, that he rarely communicated with Johnston, and that his only problem with Johnston was that Johnston was not a team player.  Doc. 37-4 at 13.

## B.    Procedural background

On November 9, 2022, Johnston filed an EEOC charge, asserting retaliation and age discrimination based on Doug Dunlap's alleged conduct, which purportedly included creating a hostile work environment with respect to age and giving Johnston's job to a younger salesman in August 2021.  Doc. 1-1.  The EEOC provided a right to sue letter (Doc. 1-2), and on May 1, 2023, Johnston timely filed his complaint.  Doc. 1.  The parties consented to magistrate judge jurisdiction.  Doc. 16; *see* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

After the close of discovery, on July 16, 2024, Defendants filed a "Motion For

Sanctions For Witness Tampering, Concealment Of Evidence, And Bad Faith Conduct In Discovery" (Doc. 24), which the parties fully briefed (Doc. 29; Doc. 30). On October 1, 2024, the court held a hearing on that motion (*see* minute entry, entered: 10/01/2024; Doc. 31). And, on October 2, 2024, the court denied the motion without prejudice and reopened discovery for limited purposes. Doc. 32.

After that, Defendants filed this summary judgment motion. Doc. 36; *see* Doc. 37 (evidentiary material); Doc. 38 (notice of conventional filing). The parties have fully briefed the motion (Doc. 45; Doc. 46; *see* Doc. 44), and the court has held an oral argument motion hearing (*see* minute entry, entered: 04/23/25; Doc. 48).

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[1] And a dispute

---

[1] *Accord, e.g.*, *Celotex*, 477 U.S. at 322–23 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts creating a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's responsibility is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and draw all reasonable inferences in favor of the nonmovant. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

## DISCUSSION

The court discusses in sequential order first Johnston's federal employment claims (Counts 1, 2, and 3), then his federal FLSA claim (Count 4), and then his Alabama state law claims (Counts 5, 6, and 7). Construing the record evidence and all reasonable inferences in Johnston's favor, Defendants are entitled to judgment as a matter of law on all but Johnston's claim for quantum meruit (Count 6).

## I. There is no genuine dispute of material fact on Johnston's federal employment claims (Counts 1, 2, and 3).

Defendants are entitled to judgment as a matter of law on Johnston's federal employment claims—i.e., retaliation (Count 1), discrimination (Count 2), and

hostile work environment (Count 3).

There are two threshold issues on Johnston's federal employment claims: (1) the statute of limitations; and (2) the DK decisionmakers for the only relevant, alleged unlawful employment practices within the statute of limitations.

*First* (with respect to the statute of limitations), an ADEA plaintiff in a non-deferral state like Alabama must file an EEOC charge within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(A); *see Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1263 (11th Cir. 2003).

In this case, Johnston filed his EEOC charge on November 9, 2022. Doc. 1-1. Thus, on the plain language of the statute, any "alleged unlawful employment practice" must have "occurred" on or after <u>May 13, 2022</u> ("within one hundred and eighty days" of November 9, 2022). *See* 42 U.S.C. § 2000e-5(e)(1).

Johnston does not contest this application of the statute of limitations. Instead, Johnston bases his opposition to Defendants' summary judgment motion on his May 13, 2022 removal from the DK payroll, and DK's decision not to rehire him in July 2022. *See, e.g.*, Doc. 45 at 2 ("The conduct that occurred within the 180-day filing period was withholding [Johnston's] pay from May 13, 2022, to June 30, 2022, and not allowing him to return to the Birmingham Warehouse to boost sales in July 2022.").

As a result, the court necessarily finds that the relevant timeframe for

Johnston's federal employment claims is May 13, 2022, to July 2022, and that the only alleged unlawful employment practices in this time period are Johnston's removal from the DK payroll in May 2022 and DK's decision not to rehire him in July 2022.

*Second*, Johnston's federal employment claims likewise are limited by the undisputed record evidence as to the DK decisionmakers for those two relevant, alleged unlawful employment practices within the statute of limitations. That undisputed record evidence shows that Bob Dunlap made the decision to remove Johnston from the DK payroll in May 2022, and that Griffin made the decision not to rehire Johnston in July 2022.

With regard to Johnston's removal from the DK payroll in May 2022, the record evidence shows that only one person took responsibility for the decision: Bob Dunlap. Doc. 37-11 at 7. Bob testified, "It would only be me," when asked if he took Johnston off the DK payroll. Doc. 37-11 at 7. Bob also testified that he "thought it was one time." Doc. 37-11 at 7.

On this point, there is no evidence that could create a genuine dispute of material fact for trial. Both Michael Dunlap and King testified that they did not know who removed Johnston from the DK payroll in May 2022. Doc. 37-5 at 26; Doc. 37-4 at 8. Both Richard Dunlap and Doug Dunlap averred that they had no involvement in the decision to remove Johnston from the DK payroll in May 2022.

Doc. 37-18 at 2; Doc. 37-6 at 2.

Furthermore, with regard to DK's decision not to rehire Johnston in July 2022, the undisputed record evidence shows that Griffin was the only decisionmaker. Bob Dunlap told Johnston to "get with Mike Griffin," and Griffin did not allow Johnston to return to work. Doc. 37-3 at 61–62; Doc. 37-5 at 13; Doc. 37-4 at 13; *see* Doc. 37-13 at 17.

Again (on this point), there is no evidence that could create a genuine dispute of material fact for trial. Griffin testified that he did not talk to Doug Dunlap about the decision because Doug was out of the office with COVID at that time. Doc. 37-13 at 17. Doug also testified that he was out of the office with COVID at that time. Doc. 37-12 at 16.

Richard Dunlap averred that he was not involved in the decision not to hire Johnston back in 2022. Doc. 37-6 at 2. Doug Dunlap also averred that he had no involvement with Johnston's employment after August 2021, and that he was not aware that Johnston had been rehired after August 2021. Doc. 37-18 at 2.

Speculation—from Johnston and/or any other witness without personal knowledge—cannot create a fact issue for trial. *See, e.g.*, *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("unsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion" because "speculation does not create a genuine issue of fact"); Fed. R. Evid. 602 ("A witness

may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Johnston and Michael Dunlap both testified that they thought Richard Dunlap and Doug Dunlap might have had some role in Johnston's removal from the DK payroll in May 2022 and the decision not to rehire him in July 2022 (Doc. 37-3 at 58–59; Doc. 37-5 at 20), but both Johnston and Michael Dunlap also testified that those suggestions were based on assumptions, that they did not know, and that they were not sure. Doc. 37-3 at 58–60; Doc. 37-5 at 19–20, 26. For example, Michael Dunlap testified, "I don't even know who terminated [Johnston]" in 2022. Doc. 37-5 at 26.

Moreover, without evidence that could support a reasonable inference, a plaintiff's "belief" cannot avoid summary judgment. *See Cordoba*, 419 F.3d at 1182 ("[The plaintiff's] belief that [a supervisor] was involved in this decision was speculation."). Johnston testified that he thought Bob Dunlap "acted like he didn't know anything about" Johnston being removed from the DK payroll. Doc. 37-3 at 58. But, without more, no jury could find or reasonably infer that anyone other than Bob removed Johnston from the DK payroll in May 2022. Likewise, Johnston stated in a letter that he believed that Richard Dunlap and Doug Dunlap influenced Griffin not to rehire him, and speculates that because Doug supervised Griffin and Richard called Griffin, they must have been involved in Johnston's termination. Doc. 37-7

22

at 56–57; Doc. 37-13 at 6; Doc. 37-13 at 20.  But, aside from that belief (and speculation), there is no record evidence to support a jury finding or reasonable inference of any such influence.

It is just too speculative to ask a jury to find or infer that, because there is evidence that Richard Dunlap and Doug Dunlap may have been out to get Johnston in 2021, they were out to get him again in 2022, where all of the undisputed evidence is to the contrary—that neither Richard nor Doug was involved at all in 2022.

As discussed above, the undisputed record evidence shows the following: Richard Dunlap was not involved with hiring, terminating, or setting compensation for Johnston, and had no authority over Johnston; Richard does not know why Johnston was terminated in 2022, and was not involved; Richard was not involved in the decision not to hire Johnston back in 2022 (Doc. 37-6 at 2); Doug Dunlap had no involvement with Johnston's employment after August 2021, and was not aware that Johnston had been rehired after August 2021; Doug was not involved in Johnston's termination in 2022 (Doc. 37-18 at 2).

As such, the court necessarily finds that the only DK decisionmaker for Johnston's removal from the payroll in May 2022 was Bob Dunlap, and that the only DK decisionmaker for the decision not to rehire Johnston in July 2022 was Griffin.[2]

---

[2] Even if the record evidence could support a reasonable inference (and it cannot) that Richard Dunlap or Doug Dunlap somehow was involved in the decision to remove Johnston from the DK payroll in May 2022 or the decision not to rehire

And therefore the court analyzes Johnston's employment claims as limited to the knowledge and actions of Bob Dunlap and Griffin. *See Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) (Title VII "[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent. When evaluating a charge of employment discrimination, then, we must focus on the actual knowledge and actions of the decision-maker") (citations and quotation marks omitted). With that, the court now turns to Johnston's three federal employment claims.

## A.    Retaliation claim (Count 1)

Defendants are entitled to judgment as matter of law on Johnston's ADEA retaliation claim (Count 1). On the retaliation claim, the complaint alleges that Johnston's termination in May 2022 and the decision not to rehire him in July 2022 were in retaliation for his protected activity of complaining about age discrimination. Doc. 1 at 24.

The ADEA "prohibit[s] an employer from discriminating against an employee because he has opposed an unlawful employment practice." *McCreight v. AuburnBank*, 117 F.4th 1322, 1339 (11th Cir. 2024); *see* 29 U.S.C. § 623(d). "'To

---

Johnston in July 2022, there still would be no room for what would need to be inferences-upon-inferences that any such involvement from Richard or Doug *also* involved age-based retaliation, discrimination, or harassment.

that end, employers cannot retaliate against employees who have complained about—that is, opposed—discrimination' based on sex, age, or other protected characteristics." *McCreight*, 117 F.4th at 1339 (quoting *Martin v. Financial Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020)).

An ADEA retaliation plaintiff must show "(1) a protected activity, (2) an adverse employment action, and (3) a causal connection between them." *McCreight*, 117 F.4th at 1339. Causation requires "[p]roof of the decisionmaker's knowledge or awareness of" the plaintiff's protected activity. *Id.*

Here (as discussed above), Johnston has identified sufficient evidence of two adverse employment actions—his termination in May 2022, and the decision not to rehire him in July 2022. The court also finds that, while thin, Johnston does have sufficient evidence to get to the jury on protected activity. But there still can be no genuine dispute of material fact on any "causal connection between them"—i.e., that Johnston's complaints about age discrimination led to his termination in May 2022 or the decision not to rehire him in July 2022. *See McCreight*, 117 F.4th at 1339.

On the evidence that Johnston engaged in protected activity by complaining about age discrimination (*see McCreight*, 117 F.4th at 1339), Johnston testified in his deposition that he complained about age discrimination to Bob Dunlap, Michael Dunlap, and Dennis King. Doc. 37-3 at 66. Johnston also testified that he told Bob that Doug Dunlap was "treating the younger salesmen differently." Doc. 37-3 at 66–

69.  In his interrogatory responses, Johnston averred that he "made the complaints verbally and in writing between October 29, 2021, and July of 2022." Doc. 37-20 at 10; *see* Doc. 37-20 at 11–12, 20–21. Johnston also averred that, "[b]etween October 29, 2021, and May 13, 2022, I repeatedly complained to Bobby Dunlap, Dennis King, Richard Dunlap, and Michael Dunlap both verbally and in writing about Doug Dunlap's behavior toward me and other older employees." Doc. 37-20 at 23. Johnston testified further that he complained "more than once" about "how [he] was being treated compared to the younger salespeople," and that the "last time" he complained was "July of 2022," though he could not "give . . . specifics" or "an exact figure" about the "number of times" he complained. Doc. 37-3 at 68.

That said, the record includes several letters and emails from Johnston complaining about purported unfair treatment, and none of them mentions age discrimination or allegations that Doug Dunlap treated younger employees differently from older employees. *See* Doc. 37-7 at 38–39, 56–58, 74, 142–45. Even in his emails after the meetings with Bob Dunlap and Mike Griffin in July 2022, Johnston makes no mention of age or of younger employees being treated differently; rather, he specifically states that he believes Richard Dunlap and Doug Dunlap "targeted" and "fired" him for being "willing to speak up when nobody else would" and "for simply telling the truth." Doc. 37-7 at 55–58. The documentary evidence shows Johnston's complaints about Doug Dunlap, but the complaints

26

appear to be based on personal animus, not age or any other protected characteristic. *See McCreight*, 117 F.4th at 1339; 29 U.S.C. § 623(d).

Plus, Michael Dunlap, Dennis King, and Richard Dunlap all testified that they never had received any complaints from Johnston about Doug Dunlap discriminating based on age. Doc. 37-6 at 2; Doc. 37-5 at 9; Doc. 37-4 at 13.

Nevertheless, at the summary judgment stage, the court must construe the evidence and reasonable inferences in the nonmovant's favor. *Centurion Air Cargo*, 420 F.3d at 1149. And that is required even where the only evidence is self-serving testimony. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253–54 (11th Cir. 2013).

In any event, there is not sufficient record evidence for Johnston to get to the jury on causation. *See McCreight*, 117 F.4th at 1339.

With respect to Griffin's decision not to rehire Johnston in July 2022, there is no evidence of the "decisionmaker's knowledge or awareness of" Johnston's protected activity. *See McCreight*, 117 F.4th at 1339. Johnston did not testify that he ever complained to Griffin about age discrimination. Doc. 37-3 at 66. Griffin testified that he "did not know" of any complaint that Johnston had made about age discrimination. Doc. 37-13 at 16. Consequently, Griffin's decision not to rehire Johnston could not have been retaliatory. *See McCreight*, 117 F.4th at 1339.

In addition, with respect to Bob Dunlap's decision to remove Johnston from

the DK payroll in May 2022, Johnston testified in his deposition that he does not "contend" Bob "retaliated against [him]." Doc. 37-3 at 69–70. Johnston testified instead, "It was Doug and Richard" Dunlap. Doc. 37-3 at 70. So Bob's decision to remove Johnston from the DK payroll could not have been retaliatory either.

Even assuming that Bob Dunlap was aware of Johnston's protected activity, Johnston testified that he could not remember when he complained about Doug Dunlap's age discrimination. Doc. 37-3 at 66–69. Johnston stopped working with Doug in August 2021. Doc. 37-3 at 59. In 2022 (after Johnston had been rehired for the fourth and final time), he was working away from Doug—in a separate situation for Michael Dunlap. Doc. 37-3 at 55–56. There also is record evidence that DK management thought that Johnston had not been doing work in 2022 and that Johnston was a problematic employee. An IT search of Johnston's DK company email in May 2022 showed that Johnston had only sent one email from his work account since January 2022, and that email was not work related. Doc. 37-1 at 2. Bob testified that Johnston could not make sales. Doc. 37-11 at 9. Several employees wrote letters over the course of Johnston's employment, expressing that he was not a good addition to DK. Doc. 37-7 at 63, 75–81. Johnston also had been removed from the DK payroll twice before he ever worked with Doug in 2021 and before he ever complained about any age discrimination. Accordingly, a reasonable jury could not find causation.

**B.    Discrimination claim (Count 2)**

Defendants are entitled to judgment as matter of law on Johnston's ADEA discrimination claim (Count 2).  On his disparate impact discrimination claim, Johnston cannot show that he was treated differently from younger employees during the relevant timeframe.

"The ADEA prohibits employment discrimination against individuals who are at least forty years old."  *McCreight*, 117 F.4th at 1334 (citing 29 U.S.C. §§ 623(a)(1), 631(a)).  "To establish a claim under the ADEA, 'a plaintiff must prove that age was the "but-for" cause of the employer's adverse decision.'"  *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

The Eleventh Circuit has clarified (and simplified) the court's summary judgment analysis of an ADEA discrimination claim into one question:  "whether the plaintiff has put forward enough evidence for a reasonable jury to conclude that illegal discrimination occurred."  *McCreight*, 117 F.4th at 1334.  In other words, "[t]he district court's task at summary judgment is to assess the plaintiff's claims according to the ordinary summary judgment standard."  *Id.*

In this case, the complaint alleges disparate treatment based on Johnston's being "screamed at and demeaned by Doug Dunlap," being given the weakest sales territory, being removed from the payroll without his knowledge, and not being allowed to come back to work at DK.  Doc. 1 at 25–27.

But, given the statute of limitations (and as discussed above), the only relevant, alleged unlawful employment practices are Johnston's removal from the DK payroll in May 2022 and DK's decision not to rehire him in July 2022.

Among other things (and as stated above), an ADEA discrimination plaintiff must show that age was the "but for" cause of the employer's alleged adverse employment action. *Gross*, 557 U.S. at 180.

As with Johnston's retaliation claim, there can be no genuine dispute of material fact on causation. No jury could find or reasonably infer that, on account of age discrimination, Johnston was removed from the DK payroll in May 2022 or not rehired in July 2022.

With regard to the only relevant, alleged unlawful employment practices, there is only impermissible speculation that "illegal discrimination occurred." *McCreight*, 117 F.4th at 1334.

Johnston's allegations, evidence, and argument are limited to Doug Dunlap's purported disparate treatment of older employees—before 2022. *See, e.g.*, Doc. 45 at 24–25. But (again, as discussed above), the only evidence is that Doug had no involvement with Johnston's employment after August 2021, that Doug was not aware that Johnston had been rehired after August 2021, that Doug had no involvement in the decision to remove Johnston from the payroll in May 2022 (Doc. 37-18 at 2), and that Griffin did not talk to Doug about the decision not to rehire

Johnston in July 2022 because Doug was out of the office with COVID at that time (Doc. 37-13 at 17; *see* Doc. 37-12 at 16).

Aside from the evidence of Doug Dunlap's wrongful conduct, there is no record evidence that anyone else at DK allegedly discriminated on the basis of age against Johnston or any other older employee. And there is no evidence that, on the basis of his age, Johnston was removed from the DK payroll in May 2022 or not rehired in July 2022. Rather (as discussed above), there is evidence of other DK employees complaining about Johnston and of doubts about his work. *See* Doc. 37-1 at 2; Doc. 37-7 at 53–54, 63, 75–81.

## C.    Hostile work environment (Count 3)

Defendants are entitled to judgment as a matter of law on Johnston's hostile work environment claim (Count 3). On the record evidence, Johnston cannot show any conduct within the statute of limitations that contributed to the alleged conduct that conceivably could amount to a hostile work environment. The complaint alleges a hostile work environment based on Johnston's being "treated in a very hostile and demeaning manner on a regular basis," being given the weakest sales territory, and being "taken off the payroll without notice." Doc. 1 at 27–28.

Under the ADEA, a plaintiff alleging a hostile work environment must show the following: "(1) he was at least 40 years old at the relevant time; (2) he was subject to unwelcome harassment based on his age; (3) the harassment was

31

sufficiently severe or pervasive to alter the terms of his employment; and (4) the employer knew or should have known of the harassing conduct but failed to take prompt, remedial action." *Harvey v. Walmart, Inc.*, No. 23-11213, 2024 WL 1460314, at *2 (11th Cir. April 4, 2024) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (elements of a hostile work environment claim), and 29 U.S.C. §§ 623(a)(1), 631(a) (relevant ADEA provisions)).

Here, Johnston cannot show that—within the statute of limitations—"he was subject[ed] to unwelcome harassment based on his age." *See Harvey*, 2024 WL 1460314, at *2.

In this regard, Johnston argues that the court can consider evidence of alleged conduct that predates the relevant timeframe because "[a]ll evidence of a hostile work environment will be viewed collectively so long as 'an act contributing to the claim occurs within the filing period.'" Doc. 45 at 27 (quoting *National R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

But Johnston premises his hostile work environment claim only on evidence that Doug Dunlap allegedly mistreated him. *See, e.g.*, Doc. 1 at 27–28; Doc. 45 at 27–29. And the undisputed evidence is that Johnston did not work directly with Doug Dunlap after August 2021. Doc. 37-3 at 59. So none of that alleged conduct "occur[red] within the filing period"—that is, on or after May 13, 2022. *See National R.R. Pass. Corp.*, 536 U.S. at 117.

Moreover, with regard to the only alleged unlawful employment practices within the filing period—i.e., Johnston's removal from the DK payroll in May 2022, and DK's decision not to rehire him in July 2022—the undisputed evidence is that Doug Dunlap was not involved. Doug had no involvement with Johnston's employment after August 2021, and was not aware that Johnston had been rehired after August 2021. Doc. 37-18 at 2.

Doug Dunlap was not involved in Johnston's termination in 2022 (Doc. 37-18 at 2), and was out of work with COVID in July 2022 (Doc. 37-12 at 16; Doc. 37-13 at 17). While Doug was Griffin's supervisor in July 2022 (Doc. 37-13 at 6), Griffin did not talk to Doug about Johnston in July 2022 because Doug was out of the office with COVID at that time (Doc. 37-13 at 17).

So there is no evidence that could support a finding or reasonable inference that Doug Dunlap was responsible for any "act . . . within the filing period" that conceivably could have "contribut[ed]" to the alleged hostile work environment. *See National R.R. Pass. Corp.*, 536 U.S. at 117. Nor is there otherwise any evidence that Johnston's removal from the DK payroll in May 2022 or DK's decision not to rehire him in July 2022 was "based on [Johnston's] age." *See Harvey*, 2024 WL 1460314, at *2.

## II. There is no genuine dispute of material fact on Johnston's FLSA claim (Count 4).

Defendants are entitled to judgment as a matter of law on Johnston's FLSA

claim (Count 4).  Under the FLSA, Johnston has not identified evidence sufficient to create a genuine dispute of material fact for trial on the necessary showing that he was not properly compensated during the relevant time period.

The complaint alleges that Johnston is owed unpaid wages under the FLSA, 29 U.S.C. § 201 et seq.  Johnston since has clarified that the FLSA claim is limited to the time period from May 13, 2022, to June 30, 2022, when Johnston contends that he was not working as an outside salesman.  *See* Doc. 45 at 30; minute entry, entered: 04/23/2025; *see also* 29 U.S.C. § 213(a)(1) (exempting outside salesmen from FLSA coverage).

"The FLSA imposes a minimum wage for covered employees and requires employers to pay overtime of at least one and one-half times the regular rate to employees working more than 40 hours a week."  *Pioch v. IBEX Eng'g Servs., Inc.*, 825 F.3d 1264, 1268 (11th Cir. 2016).  On a claim for failure to pay minimum (or overtime) wages under the FLSA, "a plaintiff must demonstrate that (1) he is employed by the defendant, (2) the defendant engaged in interstate commerce, and (3) the defendant failed to pay him minimum or overtime wages."  *Freeman v. Key Largo Volunteer Fire & Rescue Dep't, Inc.*, 494 F. App'x 940, 942 (11th Cir. 2012) (citing *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1277 n.68 (11th Cir. 2008)).

An "FLSA plaintiff bears the burden of proving that he or she worked

overtime without compensation," and it generally "is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment." *Allen v. Board Of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1315 (11th Cir. 2007).

However, "in situations where the employer's records cannot be trusted and the employee lacks documentation, the Supreme Court held that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Allen*, 495 F.3d at 1316 (citation and quotation marks omitted).

In this case, even assuming that Johnston was a DK employee from May 13, 2022, to June 30, 2022, that he was not an outside salesman, and that DK did not pay him minimum or overtime wages (*see Freeman*, 494 F. App'x at 942), Johnston still lacks evidence sufficient to create a triable fact issue on his FLSA claim (*see Allen*, 495 F.3d at 1315).

The undisputed evidence is that DK has no record of Johnston's alleged work hours from May 13, 2022, to June 30, 2022.

Under the controlling Eleventh Circuit law, Johnston has not "produce[d] sufficient evidence to show the amount and extent" of any uncompensated work that he allegedly performed in May–June 2022 "as a matter of just and reasonable

inference." *See Allen*, 495 F.3d at 1316.

Johnston has pointed to no evidence from which a jury could reasonably infer how many hours he worked. Johnston testified in his deposition that he typically worked more than 40 hours per week based only on his own memory, without any supporting documentation or testimony about the specific duties that he allegedly was performing or how long those duties may have taken. Doc. 37-3 at 40. Even for time predating the relevant period, Johnston mentioned that GPS data or a list of customers he had been seeing might support his assertion of working more than 40 hours per week, but he could not produce any such supporting evidence. Doc. 37-3 at 40–41. On the other hand (for instance), the record shows that in May 2022 King had DK's IT department check Johnston's DK emails, and the IT department reported that "Johnston had only sent one email in the last several months, and it was not work related." Doc. 37-1 at 2. Thus, without more, the evidence is insufficient for a jury to find the "amount and extent" of Johnston's alleged work in May–June 2022 "as a matter of just and reasonable inference." *See Allen*, 495 F.3d at 1316.

## III. There is no genuine dispute of material fact on Johnston's breach of contract claim (Count 5).

Turning to Johnston's Alabama state law claims, Defendants are entitled to judgment as a matter of law on Johnston's breach of contract claim (Count 5). There can be no genuine dispute of material fact for trial because the undisputed evidence shows that there was no mutual assent as to the essential terms of even an implied

36

contract.

The complaint alleges that DK agreed to compensate Johnston with a salary of $120,000 per year for work performed, but that Johnston worked for DK from July 17, 2020, until May 13, 2022, and either was not paid this full salary or was not paid at all.  Doc. 1 at 30–31.

Under Alabama law, the "basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement."  *Stacey v. Peed*, 142 So. 3d 529, 531 (Ala. 2013) (quoting *Hargrove v. Tree of Life Christian Day Care Ctr.*, 699 So. 2d 1242, 1247 (Ala. 1997)).

"Proof of an implied contract requires the same basic elements as an express contract."  *Stacey*, 142 So. 3d at 531.

"When the facts material to the question whether a contract was formed are in dispute, the fact-finder must resolve that dispute."  *Walker v. Walker*, 144 So. 3d 359, 364 (Ala. Civ. App. 2013) (citing *Sunnyland Mobile Homes, Inc. v. Thompson*, 384 So. 2d 1111 (Ala. Civ. App. 1980)).  "However, when the facts material to the question whether a contract was formed are undisputed, the existence of a contract is a question of law for the court."  *Id.* (citing *Denson v. Kirkpatrick Drilling Co.*, 144 So. 86, 91 (Ala. 1932)); *see Hardy v. City of Selma*, No. 2:21-CV-522-TFM-B, 2023 WL 8280483, at *9 (S.D. Ala. June 9, 2023).

Here, the material facts are undisputed.  Johnston never signed a written

contract with DK.  Doc. 37-3 at 66.  Johnston went to work at DK in 2018 at a salary of $120,000 per year. Doc. 37-3 at 16; Doc. 44-1.  But Johnston was removed from the DK payroll and paid severance in November 2019.  Doc. 37-3 at 21; Doc. 37-1 at 2; Doc. 37-7 at 11.  When he came back to work at DK in February 2020, Johnston put on his rehire application that his salary should be "TBT from the Dunlap family." Doc. 37-3 at 23; Doc. 37-7 at 3.  Johnston testified that his salary "was discussed verbally" and he was "led to believe it would be what he was previously hired at." Doc. 37-3 at 23.  Johnston also sent an email stating that he was fine with whatever pay Michael Dunlap decided regarding his pay; the email had a handwritten note stating that Johnston would receive the same pay.  Doc. 44-2.

Johnston was removed from the DK payroll again in July 2020 (Doc. 37-3 at 26, 33, 39), and was rehired in 2021 at a salary of $84,000 per year (Doc. 37-3 at 31, 34, 38, 46; Doc. 37-7 at 60; Doc. 44-16).  At the time of this rehire, Johnston listed his previous salary on his rehire paperwork; but there is no evidence from this time period that Johnston discussed his salary with anyone.  Johnston testified that he "expected [his salary] to be what [he] was hired in at too."  Doc. 37-3 at 47.  There is no record evidence that Johnston ever objected to the salary change, and Johnston testified that he did not discuss his lower paycheck with anyone either.  Doc. 37-3 at 47.

Johnston again was removed from the DK payroll in August 2021 (Doc. 37-3

at 52; Doc. 44-9; Doc. 44-21; Doc. 37-7 at 21, 68; Doc. 37-12 at 17), and on his rehire paperwork in October 2021 he wrote that his previous salary had been $120,000 per year (Doc. 44-14).  But Johnston testified that he did not negotiate his salary at that time (Doc. 37-3 at 55), and the record evidence shows that Johnston told a DK administrator to confirm his pay with Michael Dunlap (Doc. 37-7 at 47).

Aside from his first rehire (i.e., Johnston's second period on the DK payroll), Johnston testified that there were no discussions about the amount of his pay before he ever was put back on the DK payroll.  Doc. 37-3 at 36, 76.  Plus, Johnston more than once signed employee handbooks stating that he was an at-will employee without a contract.  Doc. 37-7 at 18, 20.

Accordingly, the material facts are undisputed, and no reasonable jury could find or infer that Johnston and DK ever reached any mutual assent as to the essential terms for an annual salary of $120,000 after July 2020.  *See Stacey*, 142 So. 3d at 531.

## IV.    There are genuine disputes of material fact for trial on Johnston's quantum meruit claim (Count 6).

Nonetheless, there are genuine issues of material fact for trial on Johnston's quantum meruit claim (Count 6).  On the record evidence, fact questions remain about those time periods for which Johnston was not on the DK payroll but asserts that he continued to work for DK.

The complaint alleges that DK "knowingly accepted Johnston's services of

39

continuing to work either in outside sales or scouting new markets" after he was removed from the payroll. Doc. 1 at 31. The complaint also alleges that, based on his longstanding relationship with DK, Johnston had a reasonable expectation of compensation for work done while not on the payroll after July 20, 2020. Doc. 1 at 31–32.

"Generally, recovery on a theory of quantum meruit arises when a contract is implied; the law implies a promise on the party knowingly accepting the benefit of services provided by another to pay a reasonable value for those services." *Brannan & Guy, P.C. v. City of Montgomery*, 828 So. 2d 914, 920 (Ala. 2002). "When an express contract exists, an argument based on a quantum meruit recovery in regard to an implied contract fails." *Id.* at 921.

"In order to succeed on a claim based on a theory of quantum meruit, the plaintiff must show that it had a reasonable expectation of compensation for its services." *Mantiply v. Mantiply*, 951 So. 2d 638, 656 (Ala. 2006) (differentiating between contracts implied in fact and law) (citation omitted).

In addition, "[i]t is the settled law of this State that where one knowingly accepts services rendered by another, and the benefit and the result thereof, the law implies a promise on the part of the one accepting with knowledge the services rendered by another to pay the reasonable value of such services rendered." *Mantiply*, 951 So. 2d at 656 (citation and quotation marks omitted).

On this quantum meruit claim, there will be several questions for the factfinder: whether Johnston can prove by a preponderance of the evidence a reasonable expectation of compensation for his services, DK's knowing acceptance of those services and any benefit, as well as the reasonable value of those services. But, for now, the record evidence shows that Johnston has just enough to get those fact questions to trial.

Among other things, Johnston testified in his deposition that he continued working for DK after he was removed from the DK payroll several times, and that he did so based on instructions that he should "keep doing what [he was] doing" and promises that he would be put back on the DK payroll. Doc. 37-3 at 22, 25, 35–36. While this testimony may be self-serving, the court still must construe the evidence and reasonable inferences in Johnston's favor. *See Feliciano,* 707 F.3d at 1253–54. There also is record evidence that Johnston thought he still worked for DK, that DK employees knew that Johnston was performing work for DK, and that Johnston was completing tasks like submitting credit applications when he was not on the DK payroll. *See* Doc. 44-22; Doc. 44-12. Further, in August 2020 (when Johnston was off the DK payroll), his DK company email was turned back on. Doc. 37-3 at 39; Doc. 44-5. And it is undisputed that Johnston received backpay the first time he was rehired and put back on the DK payroll. Doc. 44-3. In short, the evidence that Michael Dunlap told Johnston to keep doing what he was doing, that Johnston kept

working on behalf of DK, and that on at least one occasion Johnston had been compensated for work performed while he was not on the DK payroll is enough to create genuine issues of material fact for trial. The factfinder could conclude or infer (or not) that there was an implied promise for DK to compensate Johnston for the value of his services which DK knowingly accepted and from which DK benefited, and that Johnston reasonably expected compensation for those services. *See Brannan & Guy*, 828 So. 2d at 920; *Mantiply*, 951 So. 2d at 656.

To be sure, DK has identified evidence that Johnston would have worked for DK even without compensation, that Johnston could not (or did not) access his DK company email even when it had been turned back on, that at times DK actively was trying to stop Johnston from work on its behalf, and that there were time periods during which Johnston appears not to have done any work anyway. *See* Doc. 37-3 at 25, 35, 48; Doc. 37-9; Doc. 44-6; Doc. 44-11; Doc. 37-1 at 2. And DK may prevail at trial on one or more elements of the quantum meruit claim. But the court cannot resolve those issues on this summary judgment motion.

## V. There is no genuine dispute of material fact on Johnston's fraudulent suppression claim (Count 7).

Defendants are entitled to judgment as a matter of law on Johnston's fraudulent suppression claim (Count 7). On the record evidence, Johnston cannot show any actionable duty to disclose.

The complaint alleges fraudulent suppression only as against Richard Dunlap

and Doug Dunlap, and alleges that they fraudulently suppressed the fact that Johnston was terminated and taken off the DK payroll on May 13, 2022.  Doc. 1 at 32.

In Alabama, "[t]he elements of a cause of action for fraudulent suppression are:  (1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury."  *CNH Am., LLC v. Ligon Cap., LLC*, 160 So. 3d 1195, 1201 (Ala. 2013) (quotation marks omitted).

In this case, even construing the evidence and reasonable inferences in Johnston's favor, there still can be no triable fact issue on Doug Dunlap's or Richard Dunlap's alleged duty to disclose that Johnston had been terminated and removed from the DK payroll in May 2022.  *See CNH Am.*, 160 So. 3d at 1201.

As discussed above, neither Richard Dunlap nor Doug Dunlap had any involvement with Johnston's termination in 2022.

The undisputed evidence shows that neither Richard Dunlap nor Doug Dunlap was Johnston's supervisor when he was removed from the DK payroll in 2022 (*see* Doc. 37-3 at 55–56, 59), that Richard was not involved with hiring, terminating, or setting compensation for Johnston, that he had no authority over Johnston, that he does not know why Johnston was terminated in 2022, and that he was not involved (Doc. 37-6 at 2), and that Doug had no involvement with Johnston's employment

after August 2021, that he was not aware that Johnston had been rehired after August 2021, and that he was not involved in Johnston's termination in 2022 (Doc. 37-18 at 2).  Thus, on the current evidence, no reasonable jury could find or infer that Richard or Doug had any duty to disclose that Johnston had been terminated in 2022.

## CONCLUSION

For the reasons stated above, there are triable issues of fact on Johnston's claim for quantum meruit (Count 6), and Defendants' summary judgment motion (Doc. 36) is **DENIED** as to that claim.  Otherwise, Defendants' summary judgment motion (Doc. 36) is **GRANTED**, and Counts 1, 2, 3, 4, 5, and 7 are **DISMISSED WITH PREJUDICE**.

Separately, the court will set this case for a status conference.

**DONE** and **ORDERED** this September 5, 2025.

_____

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE